AO 91 (REV.5/85) Criminal Complaint

AUSA Jude B. Rubio (312) 886-1317

# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF ___ ILLINOIS, EASTERN DIVISION ___

UNITED STATES OF AMERICA

v.

DONALD J. McGUIRE

**FILED**

NOV - 1 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE KEYS

**CRIMINAL COMPLAINT**

CASE NUMBER:

**07 CR     716**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:  Between December 18, 2000 and December 28, 2000, in the Northern District of Illinois, and elsewhere, defendant did

travel in interstate and foreign commerce, namely, between Chicago, Illinois, and Zurich, Switzerland, and Salzburg, Austria, and back, for the purpose of engaging in any sexual act (as defined in Title 18, United States Code, Section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States,

in violation of Title ___ 18 _____ United States Code, Section(s) 2423(b) __.

I further state that I am a(n) _ Special Agent, Dept. of Homeland Security, Bureau of Immigration and Customs Enforcement _ and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:  _ X _ Yes

Jennifer Sapper
Special Agent, Bureau of Immigration and Customs Enforcement

Sworn to before me and subscribed in my presence,

November 1, 2007 _____          at
Date

Chicago, Illinois _____
City and State

Arlander Keys, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Jennifer Sapper, being duly sworn, depose and state:

1.      I am a Special Agent with the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE), assigned to the Special Agent in Charge (SAC) in Chicago, Illinois. I have been so employed since August 2003 and am currently assigned to the Cyber Crimes Investigations Group in the Office of the Special Agent in Charge/Chicago, located in Oakbrook, Illinois.

2.      I have attended the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. While at FLETC, I received specialized training in several areas, including ICE Computer Crime Investigations, Child Pornography Investigations (including training on State and Federal laws regarding Child Exploitation, Obscenity, and International Sex Tourism; training on the National Child Victim Identification Program, used to track the transmission of digital images being circulated through various forms of computer-related media, such as Internet Websites; and additional training in File-Sharing/Peer-to-Peer Investigations), and Child Exploitation Investigations in general.

3.      As part of my daily duties as an ICE agent, I investigate criminal violations relating to Child Exploitation, including traveling in interstate and foreign commerce for the purpose of engaging in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b).

4.      I am familiar with the information contained in this affidavit based upon the investigation I have personally conducted, my conversations with other law enforcement officers involved in this investigation, and review of records obtained in the investigation.

1

5.    The information contained in this affidavit is not an exhaustive account of everything I know about this case.  Rather, it contains only the facts that I believe are necessary to establish probable cause in support of a criminal complaint against DONALD McGUIRE for violation of Title 18, United States Code, Section 2423(b) (traveling in interstate and foreign commerce for the purpose of engaging in a sexual act with a minor).

## FACTS SUPPORTING PROBABLE CAUSE

### Background Concerning McGUIRE

6.    DONALD McGUIRE is a Jesuit priest, affiliated with the Chicago Province of the Society of Jesus (the "Jesuits").  At least until 2006, McGUIRE was also affiliated with an organization called Mission Fides, which supported and helped organize McGUIRE's religious retreats in the United States and around the world.  Between approximately the mid-1990s and August 2003, McGUIRE's primary residence was at Canisius House, 201 E. Dempster, Evanston, Illinois, a Jesuit community shared by multiple Jesuit priests.

7.    According to documents produced by the Jesuits, McGUIRE was ordained as a priest in 1961, and has received multiple academic degrees.  After being ordained in 1961, he spent significant time acting as a "Retreat Director," giving three-, five-, and eight-day retreats, where he instructed the retreat participants concerning teachings of the Catholic church and related matters.  McGUIRE directed retreats both for religious participants, including Mother Teresa's communities in India and around the world, and lay participants.

8.    According to documents produced by the Jesuits, since at least 1991, McGUIRE has had a number of restrictions placed on him concerning interaction with minors.  In 1991, the Jesuits

2

instructed McGUIRE not to "travel on any overnight trip with any boy or girl under the age of 18 and preferably even under the age of 21." That instruction was repeated, according to the documents, in 1994. In 1995, in a letter from McGUIRE's superior to McGUIRE, McGUIRE was again ordered not to travel with minors: "I am amplifying [McGUIRE's superior's] 1991 directive: please do not travel on any overnight trip with any person, male or female, under the age of 21. In addition, I ask that you exercise extreme caution to avoid any occasion that would find you alone, behind closed doors, with anyone under the age of 21." According to the documents, McGUIRE's superior instructed him again, in February 2001, not to travel with or spend a night in the same room with anyone under 30.

9.     According to documents produced by the Jesuits, the restrictions in the previous paragraph stemmed from various complaints and allegations lodged by "parents of young men since 1991." A 2002 internal memo states, with respect to the travel restrictions: "The goal has been to prevent him from enlisting young men as personal assistants on his travels to give retreats, under the guise of fostering their priestly vocations. These young men have been, at various times, both minors and young adults. His inappropriate behavior and poor judgment have resulted in 6 complaints that have come to us from parents of young men since 1991. They allege various forms of sexually inappropriate actions with their sons, which, while not being allegations of genital contact, have involved behavior such as having a young man sleep in the same room with him, having a young man assist him in showering (at least to wash his feet for him), on one occasion buying underpants for a boy, talking incessantly about sex with them and, in at least one case, showing him pornography."

3

10.    According to documents produced by the Jesuits, McGUIRE's superiors also notified him in writing in December 1996 that he was not permitted to have overnight guests at Canisius House without his local superior's prior notice and approval.

11.    According to multiple witnesses, described below, McGUIRE continued to travel alone with boys in their teens and early 20s throughout the 1990s, and up through 2003. McGUIRE sexually molested males during this time, including Victim A, a minor, as described below.

**Information from Minor Victim A**

12.    An individual I will refer to as Victim A told investigators that McGUIRE sexually molested him between 1999 and fall 2003. In 1999, when the abuse began, Victim A was 13 years old.

13.    According to Victim A, Victim A first met McGUIRE in approximately May or June 1999 at age 13, when he was sent to live with McGUIRE in the Chicago area at a Jesuit residence called Canisius House, located at 201 E. Dempster in Evanston. Victim A initially believed that he was merely visiting McGUIRE, and would be in Chicago for only a couple of weeks. Victim A's aunt picked him up at the airport and took him to Canisius House, where Victim A was introduced to McGUIRE. Victim A told investigators that he had been very tired from his trip, and asked McGUIRE if he could take a nap. Victim A told McGUIRE that he would sleep on the floor, as McGUIRE was already on the bed, but McGUIRE insisted that Victim A sleep in McGUIRE's bed. Victim A stated that he and McGUIRE slept next to each other for approximately 25 to 30 minutes.

14.    According to Victim A, Victim A spent his first night in Chicago at 6940 Oakley, which was referred to as the "apartment," or the "office." Victim A said that this was an office used

4

by McGUIRE. After the first night, however, at McGUIRE's insistence, Victim A began to sleep in McGUIRE's room at Canisius House on most nights.[1]

15.    Victim A told investigators that after he had been in Chicago a couple of weeks, McGUIRE kept extending Victim A's trip. McGUIRE then informed Victim A that McGUIRE would be putting Victim A in a boarding school in Massachusetts at the end of summer. Victim A ended up spending the entire summer of 1999 with McGUIRE.

16.    According to Victim A, within weeks after moving in with McGUIRE in the Chicago area, McGUIRE took Victim A on a series of religious "retreats" and other trips within and outside the United States, and began sexually molesting him.

17.    Victim A stated that one of the early trips was to Missouri, where McGUIRE, Victim A, and some others stayed at the home of a physician who was treating McGUIRE after a surgery.[2] While in Missouri, McGUIRE required Victim A to participate in a "general confession," covering his entire life up to that point.[3] During Victim A's confession, Victim A stated that he had engaged

---

[1]Agents interviewed another individual, whom I will refer to as Individual F, who said that he served as an assistant to McGUIRE at various times, including during summer 2000. Individual F stated that Victim A "frequently" stayed overnight with McGUIRE at Canisius House. On some occasions, Individual F dropped Victim A off at Canisius House late at night and/or picked him up from Canisius House in the morning.

[2]According to records produced by Mission Fides, McGUIRE traveled to Missouri for hip surgery in summer 1999. The records include a group letter from McGUIRE, summarizing the year's events, which states that the physician performed hip surgery on McGUIRE, and that McGUIRE stayed in the physician's home to recuperate.

[3]Investigators separately interviewed the physician and the physician's spouse. Both stated that McGUIRE and Victim A stayed at their home on multiple occasions, beginning around the time that Victim A was entering high school. Both stated that they gave McGUIRE and Victim A two guest

(continued...)

in masturbation. McGUIRE asked Victim A if he had done any harm to himself, and told Victim A that McGUIRE would have to inspect Victim A's penis in order to determine whether Victim A had harmed himself. After the confession, McGUIRE took Victim A to McGUIRE's room and locked the door. McGUIRE had Victim A remove Victim A's clothes. McGUIRE told Victim A words to the effect of, he had "developed nicely," and used a magnifying glass to examine Victim A's penis. McGUIRE then sprayed the inside of Victim A's penis with baby oil, telling Victim A that this was so that McGUIRE could better tell if there had been any "damage" from the masturbation.

18.     Victim A stated that after what happened in Missouri, McGUIRE's sexual abuse continued to escalate. Over time, the sexual abuse included discussion of sexual topics, McGUIRE's purchasing and showing various forms of pornography to Victim A, McGUIRE's "massages" of Victim A's body and genitalia with various oils, McGUIRE's requiring Victim A to "massage" McGUIRE's body and genitalia with various oils, McGUIRE's requiring Victim A to shower with McGUIRE, McGUIRE's digital penetration of Victim A's anus, and McGUIRE's performing oral sex on Victim A. Victim A stated that McGUIRE engaged in some combination of these activities

---

[3](...continued)
rooms in a finished basement in their home to stay in. The rooms assigned to McGUIRE and Victim A were on a different level than the other bedrooms in the home, and had a private bathroom. Both the physician and the physician's spouse also recalled that McGUIRE administered confession in their home to the family and others. The physician told investigators that after many years of allowing McGUIRE to stay in his home, he finally asked McGUIRE to leave, primarily because he believed that McGUIRE was exercising inappropriate control over Victim A. According to the physician, McGUIRE did not allow Victim A to be with anyone other than McGUIRE, and McGUIRE told the physician words to the effect of, "[Victim A] has to be with me."

with Victim A practically every night between approximately May or June 1999 and August 2003, when the two were together.[4]

19.    As to discussion of sexual topics and purchasing and showing pornography to Victim A, Victim A stated that McGUIRE purported to teach him about men and women's anatomy. McGUIRE did this by showing Victim A books and lecturing Victim A in private sessions. McGUIRE showed Victim A pictures of nude women, including pictures in *Playboy* and *Penthouse*, and asked Victim A to rate the women on a scale from one to five. Victim A said that McGUIRE made Victim A tell McGUIRE what "turned him [Victim A] on" about the pictures.

20.    Victim A stated that McGUIRE took Victim A to "Video Adventure" on Clark Street. Victim A stated that McGUIRE would go into a back room dressed in civilian garb, and would come out with and rent pornographic videos. Victim A told investigators that he was not allowed in the back room because he was too young. Victim A said the videos McGUIRE rented included "man on man," "woman on man," and "woman on woman" content.

21.    Agents identified a "Video Adventure" store located at 631 Chicago Avenue in Evanston. Clark Street turns into Chicago Avenue at approximately Howard Street (7600 North), on the border of Chicago and Evanston. Video Adventure is a video rental store, featuring VHS

---

[4]For certain periods of time between 1999 and 2003, Victim A stated that he lived away from McGUIRE at boarding schools in Massachusetts and Wisconsin. Victim A said that during those periods, the abuse occurred when Victim A was with McGUIRE on vacations or during certain school recesses. According to documents produced by the boarding schools identified by Victim A, Victim A in fact attended the boarding schools at the times he described to investigators. The admission file for the Wisconsin boarding school includes Victim A's application, which identifies McGUIRE as Victim A's guardian and appears to have been completed by McGUIRE. The file also includes an August 2000 letter from Victim A's mother, stating that she grants McGUIRE legal guardianship of her son, Victim A.

tapes and DVDs, among other items. Agents interviewed personnel at Video Adventure, who stated that the store had an account for DONALD McGUIRE, 201 E. Dempster, Evanston, Illinois. According to Video Adventure personnel, McGUIRE's account was opened on or about August 16, 1997. The store's records showed that McGUIRE was late returning videos 24 times between 1997 and 2002. Video Adventure personnel told investigators that their computer system maintains information concerning only the most recent rental. McGUIRE's last rental, according to the records, was July 5, 2002, and the system identified four videos, all of which were due the next day, July 6, 2002: *Down Justin Lane*, *Hardball*, *Oceans Eleven*, and *Taboo 2001 Sex Odyssey*. According to Video Adventure personnel, *Down Justin Lane* and *Taboo 2001 Sex Odyssey* were pornographic videos. Records show that all four videos were returned on July 7, 2002 at 6:04 p.m. Investigators observed that the Video Adventure's pornographic videos were contained in a back room at the store. According to Video Adventure personnel, minors are not permitted in the back room.

22.    According to records produced by Mission Fides, McGUIRE was scheduled to be in Arizona and Washington from June 28, 2002, to July 5, 2002. The documents further show that McGUIRE was scheduled to be in Chicago, and not traveling, between the time of his July 5, 2002, arrival and July 11, 2002.

23.    According to records produced by United Airlines, McGUIRE traveled from Seattle, Washington to Chicago, Illinois on July 5, 2002, on a flight that was scheduled to depart from the Seattle airport at 6:55 a.m. According to records produced by United Airlines, Victim A traveled on the same flight, and was assigned a seat next to McGUIRE. The United Airlines records further

8

show that McGUIRE and Victim A traveled from Chicago, Illinois to Phoenix, Arizona on July 11, 2002, again on the same flight and again with seats next to each other.

24.    As to the "massage" part of McGUIRE's sexual abuse, Victim A said that he was required to massage McGUIRE, and McGUIRE massaged Victim A.    Victim A stated that McGUIRE used Johnson's baby oil, a green oil from Bath & Body Works, eucalyptus oil, and a little glass bottle with a spritzer, as part of the massages.  Victim A said that McGUIRE kept these oils in plastic ziploc bags.  Victim A stated that McGUIRE would put the oil on Victim A's penis. Victim A said that McGUIRE also used the oils and other creams to lubricate McGUIRE's thumb, before inserting it into Victim A's anus.  As to Victim A's massages of McGUIRE, Victim A said that McGUIRE required Victim A to massage McGUIRE's buttocks and perineum (the skin between the scrotum and the anus).  Victim A told investigators that McGUIRE instructed Victim A about the perineum and other parts of the male and female anatomy.

25.    On October 2, 2007, I obtained a search warrant from Magistrate Judge Denlow, to search a cardboard box labeled "MF Skincare," which was located in a storage locker maintained by Individuals D and E (described below).  I searched the box, and found that it contained (among other things) Johnson's baby oil, a green oil from Bath & Body Works, eucalyptus oil, and a spritzer. The items that I recovered from the box match Victim A's description of those oils, as described in the previous paragraph, down to the brand names and colors of the oils.

26.    Victim A described multiple trips on which McGUIRE took him between 1999 and 2003, both interstate and foreign.  As to interstate trips, Victim A stated that McGUIRE took him to Alaska, Arizona, California, Florida, Georgia, Idaho, Minnesota, Missouri, North Dakota, Oregon,

9

and Washington, among other places, mostly coinciding with retreats conducted by McGUIRE. As to foreign trips, Victim A stated that McGUIRE took him from Chicago to Tijuana, Mexico in 2000; from Chicago to Switzerland and Austria in December 2000; and from Chicago to Nicaragua in late spring/early summer of 2002. For the Mexico trip, Victim A stated that he and McGUIRE flew by airplane to San Diego, California, then traveled by car to Mexico. Victim A stated that McGUIRE sexually molested him on all of the foreign trips, and on most of the interstate trips.[5]

27.    As to the trip to Switzerland in December 2000, Victim A stated that he and McGUIRE went to visit a couple who paid for McGUIRE to come from the United States to Europe, to give a personal retreat for the couple. Victim A said that he and McGUIRE stayed in a room together in Switzerland, and that there was a cot in the corner for Victim A. One night, Victim A came to McGUIRE crying, because Victim A had masturbated. McGUIRE told Victim A that Victim A could control the desire to masturbate, and had Victim A sleep in McGUIRE's bed. McGUIRE then gave Victim A specific instructions as to how to masturbate. Victim A said that McGUIRE then took Victim A to Austria, where McGUIRE and Victim A visited spas with naked men. Both McGUIRE and Victim A were naked at the spas. Also in Austria, McGUIRE performed oral sex on Victim A, massaged Victim A's penis, and required Victim A to massage McGUIRE.

28.    According to the school calendar for the boarding school that Victim A attended during 2000, the school's Christmas Vacation for 2000-01 ran from December 16, 2000, to January

---

[5]Victim A stated that the level of abuse sometimes depended on the nature of the retreat. For example, Victim A said that the Phoenix retreats were very busy, and there was less or no sexual abuse on those trips. The Buffalo, Minnesota retreats, on the other hand, were far less busy, and Victim A said that the sexual abuse was extensive during those retreats.

2, 2001.  Further, according to documents produced by Mission Fides, McGUIRE's itinerary for December 18, 2000, through December 28, 2000, was for a private family retreat in Switzerland (for the family identified by Victim A), and a stop to Salzburg, Austria.  Mission Fides's documents further include a travel agency itinerary and invoice for McGUIRE and Victim A, as well as original boarding passes, reflecting their travel from Chicago to Zurich on December 18, 2000, by air, from Zurich to Salzburg on December 23, 2000, by rail, from Salzburg back to Zurich on December 27, 2000, by rail, and from Zurich to Chicago on December 28, 2000, by air.

29.    As to the trip to Nicaragua in May and June 2002, Victim A told investigators that McGUIRE took Victim A to Nicaragua, where they stayed at a missionary complex.  Victim A said that he and McGUIRE flew to Nicaragua separately, but flew back to Chicago together.  Victim A stated that he and McGUIRE stayed in the same room, and McGUIRE performed oral sex on Victim A and digitally penetrated Victim A's anus, in addition to requiring Victim A to "massage" McGUIRE.

30.    According to the school calendar for the boarding school that Victim A attended during 2002, the school year for 2001-02 ended on May 23, 2002.  Documents produced by Mission Fides include original boarding passes for McGUIRE and Victim A's trips to Nicaragua.  The documents show that McGUIRE traveled from Chicago to Miami to Quito, Ecuador on May 7, 2002, and then to Managua, Nicaragua on May 19, 2002, returning to Chicago on June 3, 2002.  The documents show that Victim A traveled from Chicago to Miami to Managua, Nicaragua on May 25, 2002, and returned to Chicago on June 3, 2002 (on the same flight with McGUIRE).

11

31.     Documents produced by Mission Fides include travel documents for multiple additional trips that McGUIRE and Victim A took to various states within the United States, and to foreign countries, between 1999 and 2003, sometimes along with other boys in their late teens or early 20s who were assisting McGUIRE.

32.     I have reviewed a Customs and Border Protection database that contains certain records pertaining to international travel, and searched for records pertaining to McGUIRE and Victim A. These records show that: (1) on December 28, 2000, at 2:29 p.m. in lane IR40, McGUIRE went through customs at Chicago O'Hare, arriving from Zurich, Switzerland; and at 2:30 p.m. on the same day, Victim A went through customs in the same lane, arriving from the same place; and (2) on June 3, 2002, at 6:09 p.m., both in lane XY30, McGUIRE and Victim A went through customs at Miami, Florida, arriving from Managua, Augusto, Nicaragua.

33.     The Customs and Border Protection database did not include information concerning a trip by McGUIRE and Victim A to Tijuana, Mexico. But, as described in paragraph 26, Victim A stated that McGUIRE and Victim A flew to San Diego, California, by airplane, and then continued to Mexico by car. As a result, I would not expect to find information about this trip in the Customs and Border Protection database. Moreover, documents produced by the boarding school that Victim A attended during the 1999-2000 school year include an itinerary sent by Individual D (see below) for Victim A's trip to Tijuana. The itinerary states that Victim A was to fly via United Airlines from Boston to San Diego, via Los Angeles on March 3, 2000, and then would fly from Chicago to Boston on March 12, 2000. The itinerary further states that from March 3-6, 2000, Victim A would be at the Missionaries of Charity in Tijuana, Mexico, "c/o Fr. McGUIRE." The boarding school's records

also include a February 18, 2000, letter from Victim A's mother, granting McGUIRE legal guardianship of Victim A and stating that Victim A "will be traveling with Fr. McGUIRE to destinations that include but are not limited to San Diego, California, Tijuana, Mexico and Chicago, Illinois."

34.    Victim A provided investigators with his former U.S. passport. I have inspected the stamps in the passport, and they align with the dates of foreign travel that Victim A described. (There was no stamp for Mexico; but based on my experience and training, a passport was not required for admission to Mexico at that time.)

35.    Victim A said that the sexual abuse ended in 2003, when the Jesuits ordered McGUIRE to move from Canisius House to another residence on Clark Street in Chicago.

**Information from Minor Victim B**

36.    Victim B is a male now in his 20s who met McGUIRE when Victim B was a child. According to Victim B, McGUIRE frequently traveled to the state where Victim B's family lived and gave religious retreats there. McGUIRE typically stayed with Victim B's family as part of those trips.

37.    Victim B told investigators that in or about the late 1980s, when he was approximately nine years old, McGUIRE was staying at Victim B's house, and Victim B's parents asked Victim B to let McGUIRE hear Victim B's confession. Victim B stated that he and McGUIRE were alone in a closed room in Victim B's house for the confession. According to Victim B, during the confession, McGUIRE took off his cassock and stole (religious vestments) and said words to the effect of, "Let's put the sacrament of confession aside for a moment and talk. I want to see how

13

you're developing." Victim B stated that McGUIRE then closed his eyes and placed his hand inside Victim B's pants. Victim B stated that McGUIRE also placed McGUIRE's hand inside McGUIRE's pants. McGUIRE attempted to digitally penetrate Victim B's anus. Then, McGUIRE replaced the cassock and stole and performed the rite of absolution. According to Victim B, McGUIRE told Victim B that McGUIRE's actions were "natural," and that McGUIRE was "doing his job" with respect to Victim B.

38.     Victim B said that after this incident, McGUIRE continued to travel to Victim B's home state to conduct retreats, and continued to stay with Victim B's family. According to Victim B, several years later, when Victim B was approximately 13 or 14 years old, Victim B and some of Victim B's family members attended a retreat being given by McGUIRE. During this retreat, Victim B was required to go to McGUIRE for confession. According to Victim B, while alone with McGUIRE for the purpose of confession, McGUIRE asked Victim B whether he wanted to talk about anything sexual, such as masturbation. Victim B told investigators that he wanted to avoid discussing this topic with McGUIRE, and told McGUIRE words to the effect of, "No, I haven't sinned like that." Victim B stated that McGUIRE again took off his cassock and set the sacrament of confession aside, and signaled for Victim B to come sit on the bed with McGUIRE. McGUIRE placed his hand on Victim B's leg and told Victim B that it was OK to be honest. Victim B then told McGUIRE that he had had "thoughts" and engaged in masturbation.

39.     According to Victim B, McGUIRE then told Victim B that he was living a sinful lifestyle and had an addiction to masturbation, and that McGUIRE needed to make sure Victim B hadn't "harmed himself." McGUIRE instructed Victim B to take down his pants, and McGUIRE

14

used his hand to feel Victim B's genitals. Victim B stated that McGUIRE inspected his genitals with a magnifying glass.

40.    Victim B stated that during the same retreat, McGUIRE required Victim B to "massage" McGUIRE's body, including the inside of McGUIRE's thighs, near his testicles. McGUIRE provided Victim B with baby oil in order to administer the "massage."

41.    Victim B said that within approximately one year of this retreat, Victim B's family traveled to Chicago. While there, McGUIRE asked Victim B's parents to allow Victim B, who was then approximately 13 or 14 years old, to spend the night with McGUIRE, to help him with his medications. According to Victim B, McGUIRE took Victim B back to McGUIRE's residence, and asked Victim B to get socks from McGUIRE's bag. When Victim B looked inside the bag, there were multiple pornographic magazines, including "soft core" pornography such as *Playboy* and other pornography that was more "hard core." McGUIRE asked Victim B if he saw anything in the bag, and Victim B said no, just the socks. According to Victim B, McGUIRE kept pressing until Victim B acknowledged the pornographic magazines. McGUIRE then told Victim B words to the effect of, pornography is "natural," and Victim B should be comfortable with it. McGUIRE opened the magazines and laid them on the bed, then asked Victim B if Victim B found the pictures arousing. McGUIRE put his hand on Victim B's genitals, to see if Victim B was getting an erection from looking at the pictures.

42.    According to Victim B, there were additional incidents, primarily in the context of confession, where McGUIRE traveled to Victim B's home state, and showed Victim B pornography

15

or pictures of nudes (including an art book on classical nudes), questioned him about masturbation, and touched Victim B's genitals.

**Information from Minor Victim C**

43.    Victim C is a male now in his 20s who met McGUIRE when Victim C was a child. According to Victim C, in June 1998, immediately after graduating from high school, at age 17, Victim C traveled to Chicago to assist McGUIRE. Victim C committed to stay with McGUIRE for a year, helping him with his medical and other personal needs. Victim C took over for another young man, who had been assisting McGUIRE in the same capacity for the previous year. Victim C's responsibilities included giving McGUIRE shots for his diabetes, driving him around, cooking his meals, doing his laundry, helping him shower, giving him daily massages, and keeping his finances in order.[6]

44.    Victim C told investigators that one of the first things that McGUIRE required when Victim C arrived in June 1998 was that Victim C provide a full confession to McGUIRE. As part of this full confession, Victim C confessed that he had engaged in masturbation. According to Victim C, McGUIRE "harped on" the masturbation issue as soon as Victim C said it, telling Victim C, "we're going to have to work on that."

45.    According to Victim C, shortly after this incident, McGUIRE's previous helper (who was still transitioning out of the job) told Victim C that McGUIRE needed assistance packing for a trip to Panama City Beach. The previous helper instructed Victim C to go into the hall bathroom

---

[6]Documents from Mission Fides show that Victim C went on multiple interstate and foreign trips with McGUIRE in 1998 and 1999.

(used as a closet at Canisius House) and find a particular priestly vestment that McGUIRE would need on the trip. When Victim C looked through the garment bags in the closet, he found in the bottom of one of the garment bags a compartment containing pornographic magazines, including *Playboy*. Victim C told investigators that he brought the magazines to McGUIRE. McGUIRE asked Victim C if he'd looked at the magazines, and what he thought about what he saw.

46.     Victim C said that days later, when McGUIRE and Victim C were alone in McGUIRE's room, McGUIRE told Victim C that they were going to start studying "beauty" and "art." McGUIRE pulled out the pornographic magazines from the closet, plus additional pornographic books and magazines, the *Kama Sutra*, and a book called *The Victorian Nude*. McGUIRE showed Victim C pictures of nude women in the books, and urged him to focus on the women's buttocks and breasts, and sexual positions.

47.     According to Victim C, this "study" of "beauty" and "art" continued. McGUIRE forced Victim C to look at and discuss pornography continuously, including on spiritual retreats in various states and around the world. During these sessions, McGUIRE typically showed Victim C pictures of nude women, and women and men engaged in sexual intercourse. McGUIRE required Victim C to comment on the pictures, such as by identifying what sexual positions Victim C would enjoy.

48.     Victim C said that the "study" came to an end when McGUIRE and Victim C were at a retreat in Buffalo, Minnesota. One night when Victim C was getting ready for bed, McGUIRE told him to take out the *Playboy* magazine. McGUIRE told Victim C to rearrange the room so that the lamp was shining on the centerfold of the magazine, and made Victim C describe what he did

17

and didn't like about the woman's body. Victim C told investigators that he finally threw down the magazine and said words to the effect of, "Father, I'm not doing this anymore, it's driving me crazy." According to Victim C, McGUIRE then "flew off the handle," yelling at Victim C, and saying words to the effect of, "What do you think I am? Some kind of sick pervert?" McGUIRE told Victim C that he had two, almost three, Ph.D. degrees, "what do you have?" Victim C told investigators that he left the room to clear his head, and when he came back, McGUIRE apologized.

49.     Victim C said that he called his parents the next day and told them about his fight with McGUIRE, but did not tell them everything that had been happening with McGUIRE. Victim C told investigators that his parents – who did not know all the details – encouraged him to stick out the year with McGUIRE. Ultimately, Victim C agreed to stay the entire year, as he had originally committed to do. When Victim C told McGUIRE that he'd talked to his parents about the argument, McGUIRE was extremely upset with Victim C for calling Victim C's parents, and said that McGUIRE would tell Victim C when it was okay to call home. McGUIRE told Victim C that he wanted to be in the same room while Victim C spoke to his parents, from that point on.

50.     Between June 1998 and summer 1999, part of Victim C's care of McGUIRE involved giving him massages. Victim C stated that McGUIRE kept a ziploc bag containing a variety of massage oils, including Johnson's baby oil. Victim C said that McGUIRE provided specific instruction on how to massage, including starting with the buttocks area and massaging the perineum and scrotum. According to Victim C, McGUIRE stated that massaging the perineum caused erections to go down. Victim C stated that he never witnessed McGUIRE have an erection, and McGUIRE never touched Victim C in a sexual manner.

18

51.   According to Victim C, at the end of Victim C's tenure with McGUIRE in 1999, Victim A came to work with McGUIRE in Chicago.

52.   According to documents produced by the Jesuits, in October 2000, Victim C's parents wrote to the Jesuits concerning Victim C, and the incident described above in paragraph 49. The letter stated that during the time Victim C was working with McGUIRE, Victim C called late one night, "very anxious and emotionally upset." The letter further stated: "He cried as he told us he 'couldn't take it anymore!' He stated that Father was overwhelming him with pornographic pictures and talking to him about sexual matters at every waking moment. Father was doing this, he said, to prepare him for the trip to India where he would be seeing a lot of nudity because of the lifestyle of the people in that culture. [Victim C] was exhausted from lack of sleep and constant activity in caring for Father's needs." The letter said that Victim C became more anxious while talking to his parents, and finally said he had to go see McGUIRE. "About fifteen minutes later as my husband and I were talking about what we should do, the phone rang again. [Victim C] was calling us back to say, 'Please don't tell anyone what I just told you. Father's reputation is at stake. Don't tell anyone. I'll be ok. Father said he would stop doing this immediately if it upsets me so much.' It was obvious that [Victim C] had told Father he had called us and Father insisted that he call us back immediately."

53.   In a November 24, 2002, letter to his superiors, produced by the Jesuits, McGUIRE admitted discussing pornography with Victim C, but concealed and misrepresented the full extent of his sexual discussions with Victim C: "As far as the incident involving a *Playboy* magazine, it surfaced when [Victim C] and I were packing for a mission trip at Canisius House and he brought

19

it to me.... It was not clear where the magazine came from; I suspect it was a result of one of the rooms in Canisius House by some construction workers, but I did not pursue its source. What concerned me was whether or not [Victim C] had a problem in this area and whether he was being honest with me. In the ensuing weeks, not knowing whether this young man had a problem with such materials, I asked him to read the excellent pamphlet by Jerry Kelly, S.J., on Chastity. I had him also read Thomas Aquinas on sexual modesty. On a few occasions in spare moments I encouraged him to discuss these things with me. He was very reticent, and on a retreat in Minnesota he broke into tears and said he wanted to talk with his parents. I urged him to do so. He went to the phone and a half hour later returned smiling. He said, 'They want me to listen to you. They said, "Trust Fr. McGuire."' That was the end of any conversation for the next eight months with respect to this subject."[7]

**Information from Individual D**

54.      According to Victim A, during the time period that Victim A was under McGUIRE's control, McGUIRE had an assistant, whom I will refer to as Individual D. Individual D and Individual D's spouse, whom I will call Individual E, were "followers" of McGUIRE (according to Victim A) and assisted him in business and personal matters.

55.      Agents interviewed Individuals D and E, who confirmed that they worked with McGUIRE for years, including the time period 1999 forward. Individuals D and E both stated that they observed a "very close relationship" between Victim A and McGUIRE, and that during the time

---

[7]In the same letter, McGUIRE stated as to Victim A, "[Victim A] has never traveled with me alone." This is contradicted by documents produced by Mission Fides, which show multiple interstate and foreign trips that Victim A and McGUIRE took alone.

period when Victim A and McGUIRE were together, Victim A went with McGUIRE on various trips out of state and out of the country.

56.     Individual D told agents that he/she worked with McGUIRE for over 20 years, including as his assistant. Individual D traveled extensively with McGUIRE, and accompanied him on many interstate and foreign trips, including for religious retreats conducted by McGUIRE. Individual D told investigators that over the years, McGUIRE had multiple boys and young men (primarily in their late teens and early twenties, but also younger) who assisted and traveled with him, including Victims A and C, and many others.

57.     Individual D described to investigators an incident from the years he/she traveled with McGUIRE. One was during approximately the late 1970s, during a retreat to Big Bear, California. McGUIRE, Individual D, and a minor I will refer to as Individual G, were on this trip, and staying in a family's residence. According to Individual D, Individual G stayed in the same room as McGUIRE. Individual D said that when he/she went into McGUIRE's room to pack up, he/she opened a small black back that Individual D believed belonged to McGUIRE. Inside the bag, Individual D found multiple pornographic magazines, featuring nude women. Individual D confronted McGUIRE, who said words to the effect of, "Many kids are exposed to this. They don't have anyone to walk them through it." McGUIRE told Individual D that the pornography was for "educational purposes," to "teach [Individual G]."

58.     Individual D told investigators that he/she assisted McGUIRE in making flight reservations and other travel arrangements for McGUIRE for many years, including the years 1999-2003. With respect to Victim A, Individual D said that he/she was aware that Victim A was

21

traveling with McGUIRE alone, and that Victim A and McGUIRE were staying together in hotel rooms. Individual D stated that he/she was also aware that Victim A stayed with McGUIRE at times in Canisius House.

59.     According to Individual D, Individual D reviewed and paid bills for a Mission Fides credit card used by McGUIRE, and for other McGUIRE personal bills. Individual D stated that he/she noticed an unfamiliar bill. He/she paid it the first time, without question. When the charge was repeated the following month, Individual D questioned McGUIRE. McGUIRE told Individual D that the charge was for a pornography website, and that McGUIRE purchased access to the website for Victim A, for "educational purposes."

**Information from Individual E**

60.     Individual E told agents he/she first met McGUIRE in the late 1980s at a retreat McGUIRE was giving in Arizona. Individual E continued to attend retreats given by McGUIRE for close to 20 years. During this time, Individual E observed that McGUIRE often had boys in their late teens and early 20s accompanying him on retreats and other travel.

61.     Individual E stated that in approximately 1999, Victim A came to Chicago. Within a month of Victim A's arrival, Victim A began traveling with McGUIRE, primarily on retreats. According to Individual E, Victim A lived with McGUIRE at Canisius House for much of the time that Victim A was in the Chicago area. McGUIRE told Individual E that having Victim A live at Canisius House rather than the office on Oakley seemed "natural." For summer 2002, in particular, Individual E was under the impression, based on his/her frequent interaction with McGUIRE and Victim A, that Victim A was sleeping at Canisius House with McGUIRE practically every night.

22

62.     According to Individual E, Victim C was another minor who came to Chicago to assist McGUIRE. Victim C was 17 years old when he came to assist McGUIRE, according to Victim C (see above). Over time, Individual E observed that Victim C appeared distant and tired, and would sit with his eyes glazed or fixed. Individual E asked Victim C what was wrong, and Victim C typically responded with words to the effect of, "I'm just wiped out." Individual E asked McGUIRE what was wrong with Victim C. McGUIRE responded that Victim C was homesick, and told Individual E that McGUIRE had instructed Victim C to call Victim C's parents. McGUIRE told Individual E that Victim C's parents told Victim C to do whatever McGUIRE told him to do.

## CONCLUSION

63.    Based on the foregoing, there is probable cause to believe that between December 18,

2000, and December 28, 2000, in the Northern District of Illinois and elsewhere, DONALD

McGUIRE traveled in interstate and foreign commerce, namely, between Chicago, Illinois, and

Zurich, Switzerland, and Salzburg, Austria, and back, for the purpose of engaging in any sexual act

(as defined in Title 18, United States Code, Section 2246) with a person under 18 years of age

(namely, Victim A) that would be in violation of chapter 109A if the sexual act occurred in the

special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 2423(b).

FURTHER AFFIANT SAYETH NOT.

Jennifer Sapper
Special Agent, ICE

Subscribed and sworn
before me this 1st day of November, 2007

HONORABLE ARLANDER KEYS
United States Magistrate Judge

24