UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 07 CR 716 |
| | ) | |
| DONALD J. McGUIRE | ) | Judge Rebecca Pallmeyer |

**GOVERNMENT'S NOTICE OF INTENT TO
OFFER EVIDENCE UNDER RULES 413 AND 414,
OR, IN THE ALTERNATIVE, RULE 404(b)**

PATRICK J. FITZGERALD
United States Attorney

By:    JULIE B. RUDER
APRIL M. PERRY
Assistant U.S. Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Victim A (1999-2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Victim B (1989-1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Victim C (1989-1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Victim D (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Victim E (1989-1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Victim F (1998-1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    Under Rules 413 and 414, the Government Will Offer Testimony of Victims B-E . . . . 15

    A.    Similarity of the Prior Acts to the Charged Acts . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.    Closeness in Time of Prior Acts to the Acts Charged . . . . . . . . . . . . . . . . . . . 19

    C.    Frequency of the Prior Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    D.    Presence of Lack of Intervening Circumstances . . . . . . . . . . . . . . . . . . . . . . . 20

    E.    Necessity of the Evidence Beyond the Testimonies Already Offered at Trial . . 20

II.    The Government Will Also Offer Testimony Under Rule 404(b) . . . . . . . . . . . . . . . . . 21

    A.    The Evidence Proves Issues other than Propensity . . . . . . . . . . . . . . . . . . . . . . 23

    B.    The Acts Are Similar Enough and Close Enough in Time to be Relevant . . . . . 25

    C.    The Evidence Is Sufficient to Support a Jury Finding that Defendant Committed the Similar Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    D.    The Probative Value Is Not Substantially Outweighed by Unfair Prejudice . . . 27

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

*United States v. Benally*, 500 F.3d 1085 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*United States v. Carter*, 410 F.3d 1017 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Crawford*, 413 F.3d 873 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Cunningham*, 103 F.3d 553 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Enjady*, 134 F.3d 1427 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Gabe*, 237 F.3d 954 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 28

*United States v. Gilmer*, 534 F.3d 696 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Hawpetoss*, 478 F.3d 820 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 15-18, 20

*United States v. Hilgeford*, 7 F.3d 1340 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Hitt*, 473 F.3d 146 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

*United States v. Johnson*, 132 F.3d 1279 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 25-26

*United States v. Julian*, 427 F.3d 471 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 15-16, 18-21

*United States v. Kelly*, 510 F.3d 433 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Kieffer*, 68 Fed. Appx. 726 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 23-25, 27

*United States v. King*, 126 F.3d 987 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Lahey*, 55 F.3d 1289 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Larson*, 112 F.3d 600 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. LeCompte*, 131 F.3d 767 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Meacham*, 115 F.3d 1488 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 17, 19, 26

*United States v. Polichemi*, 219 F.3d 698 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Rutledge*, 40 F.3d 879 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Samuels*, 521 F.3d 804 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Sebolt*, 460 F.3d 910 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 15, 24-25, 27

*United States v. Taylor*, 522 F.3d 731 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Vik*, 655 F.2d 878 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Wantuch*, 525 F.3d 505 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Wimberly*, 60 F.3d 281 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Withorn*, 204 F.3d 790 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

## INTRODUCTION

Defendant Donald McGuire is a child molester, with numerous victims. His technique, victim after victim, was substantially the same: isolate the boy from his family; use his role as a Catholic priest to induce the boy to begin talking about sex, in the context of confession; progress to use of pornographic magazines and videos to heighten the sexual discussion; incorporate physical contact through a claimed need for "massages," during which McGuire directed the boy to touch his penis; and then – with the younger and more vulnerable of his victims – move on to touching the boy's penis, oral sex, and digital penetration of the boy's anus. Defendant has done the same thing, with multiple victims, for many, many years.

The indictment in this case identifies one victim, "Victim A," whom McGuire molested from 1999 to 2003. Victim A will testify at trial. The government gives notice of its intent to offer evidence at trial from four additional victims – Victims B, C, D, and E – who were molested by McGuire in a similar manner, and close in time, to Victim A. Although the government could call more than four additional victim-witnesses, we have narrowed the list to focus on those whose testimony would be most relevant to the charges in the indictment, based on timing and circumstances of the interstate and foreign travel, and the abuse. Such evidence is admissible under Rule 413 and, in Victim C and E's case, Rule 414 of the Federal Rules of Evidence. In the alternative, such evidence is admissible under Rule 404(b). In addition, the government gives notice of its intent to offer evidence from Victim F at trial (who experienced many of defendant's "grooming" techniques, like Victim A, but who was not sexually assaulted) as direct evidence and under Rule 404(b).

## FACTUAL BACKGROUND

McGuire was a priest, affiliated with the Chicago Province of the Society of Jesus (the "Jesuits"). After being ordained in 1961, McGuire acted as a "Retreat Director," giving three-, five-, and eight-day spiritual retreats, where he instructed the retreat participants concerning Catholicism. McGuire directed retreats both for religious participants, including Mother Teresa's communities in India and around the world, and lay participants. McGuire was an extremely prominent priest, with a loyal international following.

Since no later than the late 1980s, and at least until 2002, McGuire typically traveled to retreats accompanied by a boy between the ages of 13 and 18. In the latter part of this time period, McGuire sometimes had a male accompanying him who was between the ages of 18 and 20. Most of the males were from families whose parents were devoted McGuire followers.

Between approximately the mid-1990s and approximately fall 2002, McGuire's primary residence when he was not traveling was at Canisius House in Evanston, Illinois, a Jesuit community shared by multiple Jesuit priests.

**Victim A (1999-2003)**[1]

Victim A – the same "Minor Victim A" referenced in Counts One through Three of the Indictment – was sexually molested by McGuire between 1999 and at least fall 2003. In 1999, when the abuse began, Victim A was 13 years old.

In approximately May 1999, Victim A's mother told him that he was going to Chicago to meet McGuire, Victim A's "godfather." After flying to Chicago, Victim A was taken to Canisius

---

[1]The government produced statements of Victims A through F, as well as other witness statements, to defendant on August 27, 2008.

2

House, where he met McGuire for the first time.  In the first days and weeks of meeting McGuire, Victim A learned that McGuire purported to have chronic health problems, including diabetes, hemochromatosis, and asthma.  McGuire had young males working for him as "helpers," who carried McGuire's luggage, rubbed his feet and body, and helped him get dressed, among other things.

Shortly after Victim A arrived in Chicago, McGuire left for a trip, which included St. Charles, Missouri, where McGuire had surgery.  Victim A joined McGuire, who was staying at a private residence.  Although the family hosting McGuire provided separate bedrooms for McGuire and Victim A, McGuire insisted that Victim A sleep with him in his room, in his bed.

During this trip, McGuire administered confession to Victim A.  Victim A told McGuire, among other things, that he had engaged in masturbation.  McGuire told Victim A that he had a problem, and that he was "addicted" to masturbation.  McGuire asked Victim A if he had done any harm to himself, and told Victim A that he would have to inspect Victim A's penis in order to determine whether Victim A had harmed himself.  McGuire took Victim A to his room and locked the door.  McGuire had Victim A remove his clothes.  McGuire told Victim A that he had "developed nicely," and used a magnifying glass to examine Victim A's penis.  McGuire sprayed the inside of Victim A's penis with baby oil, telling him that this was so that McGuire could better heal any "damage" from the masturbation.

McGuire's sexual abuse continued for the entire first summer Victim A was with him and for the next four years.  Victim A accompanied McGuire on multiple interstate and foreign trips. During these trips, including the three trips specifically identified in the Indictment, and at Canisius House, McGuire engaged in the following activity:

Both on interstate and foreign trips and at Canisius House, McGuire required Victim A to sleep with him in his bed, unclothed.  When Victim A first came to live with McGuire, he wore pajamas to bed.  In or about summer 1999, McGuire told Victim A that it looked like he was wearing a "suit" to bed.  Victim A continued to wear pajamas to bed for awhile, but McGuire asked him to remove his pajamas.  This happened repeatedly in the first months that Victim A was with McGuire.  Eventually, Victim A stopped wearing pajamas to bed at all, because McGuire would make Victim A remove them anyway.

McGuire talked to Victim A extensively about sex and the human body.  McGuire showed Victim A nude pictures of women in pornographic magazines, such as *Playboy*, *Penthouse*, and *Hustler*.  McGuire said that the pictures of the women were degrading, but he forced Victim A to look at them, and asked him questions about the pictures.  Typically, McGuire asked Victim A questions such as, what did he like about these women, and do these women turn him on?  McGuire sometimes asked Victim A to rate the women on a scale, such as from one to five.  McGuire also showed Victim A pornographic videos, which McGuire rented while wearing civilian garb.

McGuire required Victim A to give him "massages," and to submit to McGuire's massages of Victim A.  McGuire gave Victim A specific instruction on how to massage him, using baby oil.  He always said to start with the buttocks, because that is the largest muscle.  McGuire told Victim A to massage his "perineum," which he told Victim A was the skin between the scrotum and the anus.  Victim A did not know the term "perineum" until McGuire taught it to him.  McGuire used the massage creams and oils to touch Victim A's penis.  McGuire also used the lubricants on his thumb, which he inserted into Victim A's anus.

In addition to McGuire's touching Victim A's penis and anus, McGuire frequently performed

4

oral sex on Victim A, placing his mouth on Victim A's penis.

McGuire instructed Victim A to masturbate in front of him. At times, he gave Victim A specific instruction about what to do. For example, more than once, McGuire instructed Victim A to masturbate until a certain point, then wait for his erection to go down, then to masturbate again. McGuire told Victim A that these and other activities were required in order to get him over his purported "addiction" to masturbation. Victim A did what McGuire said, among other reasons, because McGuire said that he was Victim A's "spiritual adviser," and was teaching Victim A how to get over what he said was a "problem" Victim A had.

McGuire frequently required Victim A to take showers with him. In the shower, McGuire instructed Victim A to wash him, including his genitals. McGuire touched Victim A in the shower also, including his genitals.

**Victim B (1989-1991)**[2]

Victim B's parents were very religious, and met McGuire at a retreat. McGuire solicited Victim B to become McGuire's assistant in approximately 1989, when Victim B was 15 years old. Promptly after Victim B began helping McGuire, McGuire appeared nude in front of Victim B, asking Victim B to give McGuire an insulin shot in McGuire's buttocks.

Victim B traveled with McGuire on retreats, and stayed with McGuire both on the retreats and at Canisius House. During the first trips, McGuire instructed Victim B to undress in front of McGuire, even though Victim B was uncomfortable. McGuire told Victim B to "loosen up." After several weeks, at Canisius House and on many of the trips, Victim B slept with McGuire in McGuire's bed, at McGuire's instruction.

---

[2]Victims B and C traveled with McGuire separately, but during overlapping time periods.

McGuire often initiated discussions with Victim B about masturbation, primarily during confession. McGuire typically pressed Victim B with questions until Victim B admitted engaging in masturbation. McGuire also showed Victim B pornographic magazines, including *Playboy* and *Penthouse*. McGuire typically bought such magazines on occasions when he was not dressed as a priest, and brought them along on his travels with Victim B. McGuire spoke to Victim B about the beauty of the human body and the beauty of sex. McGuire also rented and showed Victim B pornographic movies.

Approximately one month into his travels with McGuire, Victim B began giving McGuire "massages," at McGuire's instruction. McGuire instructed Victim B to massage his back, as well as the area between McGuire's scrotum and anus. McGuire was naked during the massages, and gave Victim B baby oil and other lubricants in order to do the massage. Later, McGuire also massaged Victim B's genitals and inserted his fingers into Victim B's anus. McGuire performed oral sex on Victim B at least twice. Victim B was extremely upset at McGuire's behavior, but McGuire told Victim B that McGuire's actions were "natural" and "healing."

### Victim C (1989-1992)

Victim C grew up in a very religious family, and his mother wanted him to be a priest. Victim C's mother agreed to allow Victim C to serve as an assistant for McGuire beginning when Victim C was approximately 13 years old. McGuire took Victim C to various states and around the world, primarily on retreats.

McGuire controlled where Victim C slept on the trips, insisting that Victim C sleep in McGuire's room. The vast majority of the time, McGuire required Victim C to sleep with McGuire in McGuire's bed. While in Chicago, Victim C slept in McGuire's bed at Canisius House. McGuire

hid Victim C in Canisius House, telling Victim C that McGuire was not supposed to have guests there.  Victim C initially wore boxer shorts to sleep in, but McGuire made fun of him, and Victim C eventually slept nude with McGuire.

When Victim C first began assisting McGuire during the retreats, McGuire required that Victim C provide full-body massages with baby oil.  McGuire would lie completely naked on his stomach, and direct Victim C to massage McGuire's buttocks, thighs, and back area, as well as McGuire's groin and scrotum.  After the first retreat, McGuire also began "massaging" Victim C, touching Victim C's penis and inserting his fingers in Victim C's anus.

McGuire showed Victim C pornography, including pornographic movies and pornographic magazines such as *Playboy*, *Penthouse*, and *Hustler*.  McGuire said words to the effect that he was trying to help Victim C appreciate the beauty of the naked body, without becoming aroused.  On multiple occasions, McGuire touched Victim C's genitals and digitally penetrated Victim C's anus while showing Victim C the pornography.  McGuire told Victim C that what they were doing was "natural," and what God intended.

Victim C went to McGuire for confession.  During those discussions, McGuire insisted that Victim C elaborate on sins of a sexual nature, and said he wanted to counsel Victim C on such sins.  McGuire specifically addressed masturbation, telling Victim C that Victim C was a "messed-up boy" who had a problem with masturbating to pornography.

### Victim D (1992)

Victim D and his parents were very religious.  In approximately 1992, a family friend told Victim D and his parents that there was a priest, McGuire, who traveled across the country conducting religious retreats, and that McGuire needed medical assistance.  Victim D's father looked

into it, and consented to Victim D's traveling with McGuire as his assistant.

In or about summer 1992, when Victim D was 15 years old, he assisted McGuire at a retreat. Victim D then traveled with McGuire around the United States and the world for a total of approximately four months, over one year's time. Over that year, Victim D observed that McGuire was like a celebrity, with people frequently praising him.

During these trips, at McGuire's direction, Victim D gave McGuire full-body massages. McGuire lay fully nude on his bed, with a washcloth covering his genitals. During the massages, McGuire instructed Victim D as to what to do, and provided baby oil for Victim D to use. During the latter part of Victim D's travels with McGuire, McGuire directed Victim D to massage McGuire's testicles. McGuire also required Victim D to shower with him.

At Canisius House, one to two days before a trip to India, McGuire mocked Victim D for wearing pajamas to bed. McGuire told Victim D that when he wore pajamas, it looked like he was wearing a "tuxedo" to bed. McGuire also told Victim D that it did not make sense to wear pajamas, because he would end up getting oil on them (from the massages that McGuire required Victim D to give to him), and they could not do laundry on their travels. On McGuire's instructions, Victim D then, from that point on, slept fully nude, and gave McGuire massages while nude.

When Victim D became McGuire's assistant, he went to him for confession. As part of confession, Victim D confessed that he had engaged in masturbation. McGuire became encouraging and told Victim D that he would "tutor" him in this matter. Thereafter, during the time Victim D was McGuire's assistant, McGuire frequently spoke to Victim D about masturbation and sexual topics, including when they were not engaged in confession. For example, on multiple occasions McGuire quizzed Victim D about the different positions that people could use when making love.

8

He talked to Victim D about sex, described sexual positions to Victim D, and encouraged Victim D to come up with his own ideas of sexual positions.

In approximately early 1993, Victim D went to Russia and Poland with McGuire, where McGuire was conducting retreats for Mother Teresa's sisters.  During most of the nights of this trip, Victim D slept in the same bed with McGuire.  During a stop in Frankfurt, McGuire and Victim D stayed in a hotel.  At the Frankfurt airport, McGuire – who was not dressed as a priest at the time – bought three pornographic magazines at one of the stores.  McGuire later showed Victim D the pornographic magazines, including *Playboy* and *Hustler*.  McGuire told Victim D that there was nothing wrong with the human body, and that the pornography was like artwork, comparable to the paintings in the Sistine Chapel.  McGuire said that he looked at these pornographic magazines in order to keep abreast of what his confessees were bumping into.  McGuire said that he wanted to tell his confessees, including Victim D, that the human body was not bad.  On other occasions, McGuire showed Victim D pornographic movies.

On the trip to Russia and Poland, McGuire told Victim D during and outside of confession that he would help Victim D to conquer the habit of masturbating.  He instructed Victim D to put off masturbating until the evening, so that Victim D could masturbate when he was there.  This was, as he explained, a way of learning to control one's sexual impulses in preparing for marriage.  Victim D followed McGuire's direction, and masturbated in front of McGuire.  While he did so, McGuire massaged Victim D's testicles.

### Victim E (1989-1994)

Victim E's parents, who were very religious, told Victim E that McGuire was the family's "spiritual adviser."  McGuire frequently stayed at Victim E's house when Victim E was a child,

9

when McGuire came to the city where Victim E lived.

In approximately summer of 1989, when Victim E was nine years old, McGuire was staying at Victim E's family's house for a visit. Victim E's parents wanted him to go to McGuire for confession, so he did. McGuire wanted Victim E to talk about his whole life, and any sins he had committed in his life up to that time. Specifically, McGuire asked if Victim E had engaged in impure thoughts, and if Victim E had engaged in masturbation. At that point in time, at age nine, Victim E didn't even know what masturbation was. McGuire took off the stole he was wearing and said words to the effect of, "Let's leave the sacrament of confession behind for a moment and talk." Among other things, he then said words to the effect of, "I want to see how you're developing." McGuire closed his eyes, told Victim E to lay back on the couch, and put his hands inside Victim E's pants and underwear, touching Victim E's penis. Victim E saw McGuire, who was standing, put his other hand into his own pants. Victim E felt McGuire try to put his finger into Victim E's anus, which was painful. Then, McGuire put the stole back around his neck, and performed the rite of absolution. While still alone in the room for confession, McGuire told Victim E that what he had done (that is, putting his hand on Victim E's penis and inside his anus) was "natural," and he was doing his job.

When Victim E was around the same age, in a private discussion with McGuire at the house, McGuire showed Victim E an art book containing sculptures of nude men and women. McGuire told Victim E that the nude body was a beautiful thing, and that it was important to be comfortable with the nude body.

A few years later, in approximately September 1992, when Victim E was 13 years old, Victim E's father went on a spiritual retreat directed by McGuire in Casa Grande, Arizona. Victim

E's father brought Victim E along to help McGuire, and so that Victim E could sit in on some of the conferences during the retreat.  McGuire had another boy traveling with him at the time.  McGuire had both Victim E and the other boy take care of him during the retreat.

At the retreat, Victim E went to McGuire for confession.  McGuire specifically asked Victim E whether he had engaged in masturbation.  Because of his previous experience with McGuire, Victim E did not want to talk about masturbation or anything sexual, so Victim E told McGuire words to the effect of, "no, I haven't sinned like that."  McGuire took off his stoll, like he had the previous time, indicating that he was setting the confession aside.  He signaled for Victim E to come sit next to him on his bed.  McGuire put his hand on Victim E's leg, and told Victim E that it was OK to be honest.  Victim E then told McGuire that he had experienced sexual thoughts, and had engaged in masturbation.

McGuire then said that he needed to make sure Victim E had not harmed himself.  He said that Victim E had an "addiction," and was leading a sinful lifestyle.  McGuire said that he would help Victim E overcome this addiction.  He told Victim E to pull down his pants, which Victim E did.  McGuire then touched Victim E's penis and testicles.  McGuire had a magnifying glass, and he looked at Victim E's penis through the magnifying glass.  At the end of the confession, he performed the rite of absolution.  (This later happened again, at another retreat.)

During the same retreat, McGuire and Victim E were alone in his bedroom, and McGuire required Victim E to give him a massage.  McGuire had baby oil with him, and directed Victim E to use the oil to massage him.  McGuire took off his pants.  He was wearing boxer shorts, but his testicles were coming out of his underwear.  First, McGuire told Victim E to massage McGuire's feet.  McGuire then instructed Victim E to massage inside his thighs, including his testicles.

11

In approximately June 1994, Victim E's family traveled to Chicago for vacation. Victim E stayed overnight, alone with McGuire, inside McGuire's room at Canisius House. Once they were inside his room, after Victim E helped McGuire with medications and other tasks, McGuire told Victim E to go get his socks out of a certain bag. When Victim E opened the bag, he saw that there were pornographic magazines inside, including a *Playboy* and other pornographic magazines. Victim E did not say anything to McGuire about the pornographic magazines. Even so, McGuire asked Victim E if he saw anything when he went into McGuire's bag. Victim E said no. McGuire kept pushing, and Victim E eventually acknowledged that he saw the magazines.

McGuire said that the images in the pornographic magazines were natural, and that Victim E should be comfortable with the naked body and the human form. He took out the magazines, laid them out on his bed, and opened up the pages. McGuire asked Victim E if the pictures were arousing, and how he felt looking at them. While asking these questions, McGuire put his hand on Victim E's thigh. Then, McGuire put his hand on Victim E's penis, on the outside of Victim E's pants, checking to see if Victim E was getting an erection from looking at the pornographic magazines. He asked multiple times if Victim E was getting aroused.

A few weeks later, also in summer 1994, McGuire came to Phoenix again and stayed at Victim E's family's house for at least one night. Again, Victim E was required to go to McGuire for confession. While they were alone for the confession, McGuire started talking to Victim E about masturbation and impurity. McGuire told Victim E to pull down his pants and underwear, and McGuire looked at Victim E's penis very closely. McGuire touched and stroked Victim E's penis and testicles. He also was trying to rub the inside of Victim E's thigh. While he was doing this, McGuire told Victim E that he was doing his job, that what he was doing was natural and normal,

12

and that he was helping Victim E with what he said was Victim E's "addiction" to masturbation.

**Victim F (1998-1999)**

Victim F is from a very religious family. In 1998, right after graduating from high school, Victim F went to Chicago to be McGuire's assistant. One of the first things that Victim F did after beginning work for McGuire was to go to him for confession. McGuire told Victim F that he wanted Victim F to do a "general confession." Among other things, Victim F told McGuire in confession that he had engaged in masturbation. McGuire harped on this as soon as Victim F said it. He said words to the effect of, "We're going to have to work on that."

When Victim F first arrived in Chicago, McGuire's previous assistant was still finishing up his work for McGuire. Before that assistant left, he told Victim F that McGuire needed help packing for a trip. The departing assistant told Victim F to go into a bathroom in the hall outside McGuire's room at Canisius House, which contained a closet, to find a particular priestly vestment that McGuire would need on the trip. When Victim F looked through the garment bags in the closet, he found in the bottom of one of the garment bags a compartment containing pornographic magazines, including *Playboy*. Victim F immediately brought the magazines to McGuire. McGuire told Victim F that the magazines were probably the departing assistant's. He also said words to the effect of, are you sure you didn't look? He looked through the magazine with Victim F and asked Victim F to describe the women Victim F saw in the magazine. Then McGuire took the magazines.

Days later, when McGuire and Victim F were alone in McGuire's room at Canisius House, McGuire told Victim F that they were going to start studying "beauty" and "art." McGuire pulled out the pornographic magazines from earlier, plus additional pornographic books and magazines (including *Hustler* and *Penthouse*), the *Kama Sutra*, and a book called *The Victorian Nude*.

McGuire showed Victim F pictures of nude women in the books, and urged Victim F to focus on the women's buttocks and breasts, and sexual positions.  For example, McGuire said things like, "Thomas Aquinas says the sphere is the perfect form of beauty, and women's buttocks and breasts are things we have to understand."  McGuire told Victim F that they were going to talk about sex, nudity and beauty every day as their special "study time."

This "study" of "beauty" and "art" continued for months, every day.  McGuire forced Victim F to look at and discuss pornography continuously, including on retreats in various states and around the world.  At McGuire's insistence, Victim F packed the pornography in their suitcases when they traveled on these retreats.  McGuire and Victim F would stay up late nights after working all day, and "study" pornography.  During these sessions, McGuire typically showed Victim F pictures of nude women, and women and men engaged in sexual intercourse.  McGuire required Victim F to comment on the pictures, such as by identifying what sexual positions Victim F would enjoy.

McGuire and Victim F had "study" sessions in the car as well.  McGuire would have Victim F describe his perfect woman, head to toe.  McGuire would have Victim F describe his ideal sexual encounter, including sexual positions used.   McGuire discussed breast sizes and which measurements were optimal for the beauty and curvature of a woman.

This "study" came to an end when McGuire and Victim F were at a retreat at Christ the King Center in Buffalo, Minnesota (a retreat center where Victim A was molested, as charged in Count Three of the indictment).  One night when Victim F was getting ready for bed, McGuire told him to take out the *Playboy* magazine.  McGuire told Victim F to rearrange the room so that the lamp was shining on the magazine's centerfold, and made Victim F describe what he did and didn't like about the woman's body.  Victim F finally threw down the magazine and said words to the effect

14

of, "Father, I'm not doing this anymore, it's driving me crazy." They had an argument, and Victim F called his parents, although he didn't fully describe what had been happening with McGuire.

Between June 1998 and summer 1999, part of Victim F's care of McGuire involved giving him "massages" from head to toe, every night and some mornings. McGuire kept a ziploc bag containing a variety of massage oils, including baby oil. McGuire provided specific instruction on how to massage. He instructed Victim F to begin with his buttocks because once they were massaged, they helped to relax the whole body because they were big muscles. After months of this, McGuire then requested Victim F massage his scrotum as well. McGuire used the term "perineum," which Victim F had never heard before.

Victim A came to stay with McGuire toward the end of Victim F's time with McGuire. When Victim A came into the picture, McGuire seemed to pay much closer attention to Victim A than to Victim F. McGuire wanted Victim A to take over some of Victim F's duties.

## ARGUMENT

This Court has wide discretion in admitting evidence of other acts of sexual misconduct and molestation, and appellate review is highly deferential. *United States v. Hawpetoss*, 478 F.3d 820, 823 (7th Cir. 2007); *United States v. Julian*, 427 F.3d 471, 487 (7th Cir. 2005); *see also United States v. Sebolt*, 460 F.3d 910, 916 (7th Cir. 2006) ("Owing special deference to the district court's decision [to admit evidence of prior molestations], we will not overturn it unless no reasonable person could agree with it.").

## I.    Under Rules 413 and 414, the Government Will Offer Testimony of Victims B-E

Federal Rule of Evidence 413(a) provides, "In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense

or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant."[3] Rule 414 applies similarly in cases involving child molestation, where the minor is under 14 years old.

These rules permit courts to admit evidence of defendant's commission of other offenses of sexual assault or child molestation for any relevant purpose, including to show defendant's propensity to engage in the crime charged in the indictment. *Hawpetoss*, 478 F.3d at 823 (Rules 413 and 414 "create an exception to the general rule against 'propensity evidence'"); *Julian*, 427 F.3d at 486 (noting that Rule 413 "alters the legal landscape with respect to a defendant's prior crimes" by permitting such crimes to be admitted to show "the defendant's propensity to engage in the offense of sexual assault with which he has been charged").[4]

The Seventh Circuit has endorsed a "flexible approach" in determining admissibility of evidence under Rules 413 and 414, under which the district court has broad discretion that is not "cabine[ed] artificially through the imposition of a relatively rigid multi-factor test." *Hawpetoss*, 478 F.3d at 825. Although a district court can consider multiple factors in determining admissibility – such as similarity of the prior acts to the acts charged, closeness in time of the prior acts to the acts charged, the frequency of the prior acts, the presence of lack of intervening circumstances, and the necessity of the evidence beyond the testimonies already offered at trial – and such factors are a

---

[3]An "offense of sexual assault" is defined broadly at Rule 414(d), to include the conduct at issue in this case.

[4]*See also United States v. Benally*, 500 F.3d 1085, 1093 (10th Cir. 2007) ("Evidence of other similar crimes involving sexual assault and child molestation was determined by Congress to be probative of a defendant's propensity to commit such crimes. . . . The purpose for introducing evidence of [defendant's] prior sexual assaults was to provide the jury with just such probative propensity evidence.").

"helpful guide," no factor alone is decisive. *Id.* at 825-26.

Once a court determines the relevance of prior acts of sexual assault under Rules 413 and/or 414, the court must still perform an analysis under Rule 403, and exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* at 824. But the Rule 403 analysis must take into account that the Congressional purpose of Rules 413 and 414 was to make sure that a jury would be able to hear evidence of a defendant's prior sexual assaults and child molestations, as relevant evidence concerning whether the victim in the indictment was likewise molested. *United States v. Withorn*, 204 F.3d 790, 794 (8th Cir. 2000) (in 403 analysis, "courts must balance probative value against potential for unfair prejudice 'in such a way as to allow the new rules their intended effect'"); *see also United States v. Crawford*, 413 F.3d 873, 876 (8th Cir. 2005) (noting "strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible") (citation omitted); *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998) (under Rule 413, "the exclusion of relevant evidence under Rule 403 should be used infrequently, reflecting Congress' legislative judgment that the evidence 'normally' should be admitted"); *United States v. Meacham*, 115 F.3d 1488, 1492 (10th Cir.1997) ("Rule 403 balancing is still applicable, but clearly under Rule 414 the courts are to 'liberally' admit evidence of prior uncharged sex offenses."). On this issue, the Seventh Circuit observed:

> Congress enacted these new rules to 'protect[] the public from rapists and child molesters.... In child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant ... that simply does not exist in ordinary people.

*Hawpetoss*, 478 F.3d at 824 n.7 (citation omitted). The Seventh Circuit has further explained the unique treatment of other-act evidence in sexual assault cases by ruling that admission of such evidence is appropriate in cases where a victim-witness's credibility in describing a sexual assault

is at issue: "As the legislative history reveals, Congress enacted Rule 413 because sexual assault cases, especially cases involving victims who are juveniles, often raise unique questions regarding the credibility of the victims which render a defendant's prior conduct especially probative." *Julian*, 427 F.3d at 487; *Withorn*, 204 F.3d at 794 (other-sexual-assault evidence is "'exceptionally probative' of a defendant's sexual interest in children").

Using the "helpful guide" enunciated in *Hawpetoss*, all of the factors typically considered in a Rule 413/414 analysis (discussed in Sections A through E, below) weigh in favor of this Court's admitting the testimony of Victims B through E:

### A.    Similarity of the Prior Acts to the Charged Acts

McGuire had a consistent plan and pattern to groom boys for sexual abuse, and to molest them: First and foremost, he separated the boy from the boy's family, exercising absolute control over him. He dictated where the boy traveled, where he slept, and what he wore. He ridiculed the boy about the boy's selected bedtime clothing, to induce nudity. He used the confession to initiate talk of masturbation, and assumed the role of a "counselor" of sorts, to teach the boy about sexual topics. He showed the boy pornography, under the guise of teaching him about the beauty of the human body. He demanded naked massages with body oil, instructing the boy to focus on the area surrounding his genitals. And he then moved to more aggressive sexual contact, massaging the boy's genitals and inserting his finger into the boy's anus. In several cases, but not all, he performed oral sex on the boy.

This is what McGuire did with Victim A. And, as described in detail above, it is what he did with Victims B, C, D, and E. The prior acts are very similar to the charged acts. *United States v. Hitt*, 473 F.3d 146, 159 (5th Cir. 2006) (affirming district court's admission of other-sexual-assault

evidence under Rule 413 where other acts were "*modus operandi* evidence" concerning defendant's methods of sexually abusing victims); *United States v. Carter*, 410 F.3d 1017, 1022 (8th Cir. 2005) (affirming court's admission of testimony of three victims, in addition to victims charged in indictment, where the "methods for seducing them [the additional victims] were consistent with the complaining witnesses' experiences").

### B.    Closeness in Time of Prior Acts to the Acts Charged

As both Congress and the Seventh Circuit have observed, there is no time limit on admissibility of prior sex offenses.  *Julian*, 427 F.3d at 486 (quoting Congressional Record and ruling that there is no time limit); *see also Meacham*, 115 F.3d at 1492 (quoting Congressional record, "No time limit is imposed on the uncharged offenses for which evidence may be admitted; as a practical matter, evidence of other sex offenses by the defendant is often probative and properly admitted, notwithstanding very substantial lapses in time in relation to the charged offense or offenses.").  The date of the prior offense does, however, remain a factor for the court to consider as part of its Rule 403 analysis.  *Julian*, 327 F.3d at 486.

Here, Victims B, C, D, and E all were sexually assaulted by McGuire within ten years of McGuire's abuse of Victim A.  Indeed, although the government does not propose to call as a witness every person that McGuire victimized during the time period 1989-1999, Victims B, C, D, and E, along with Victim F, represent the bulk of McGuire's relationships with boys leading up to Victim A's arrival in Chicago.  The prior acts are thus close in time to the acts charged.  *Cf. Julian*, 427 F.3d at 485-86 (affirming admission of prior assault under Rule 413 where such assault occurred 12 years before events underlying charges in case); *United States v. Kelly*, 510 F.3d 433, 437 (4th Cir. 2007) (22 years); *United States v. Gabe*, 237 F.3d 954, 960 (8th Cir. 2001) (20 years); *Meacham*,

115 F.3d at 1495 (30 years); *United States v. Larson*, 112 F.3d 600, 605 (2d Cir.1997) (16-20 years).

### C.     Frequency of the Prior Acts

As with Victim A, McGuire's interaction with Victims B, C, and D was very frequent, because McGuire was with them for concentrated time periods while traveling.  This was not one-time abuse:  McGuire's "relationships" with each of these boys, including Victim A, were prolonged over a period of months or years.  *Hawpetoss*, 478 F.3d at 826 (other victims' testimony admissible where acts were frequent and continued over a long period of time).  The interaction with Victim E was less frequent, because Victim E did not travel as widely with McGuire as an "assistant" as Victim A and the others did.  But Victim E did serve as McGuire's helper at certain retreats, and had a series of encounters with McGuire during visits in his home state and in Illinois over a five-year period.[5]

### D.     Presence or Lack of Intervening Circumstances

There were no intervening circumstances between McGuire's abuse of Victims B through E, on one hand, and his abuse of Victim A, on the other.  This, too, weighs in favor of admissibility.

### E.     Necessity of the Evidence Beyond the Testimonies Already Offered at Trial

Courts addressing this factor typically consider the extent to which the primary victim's testimony is likely to be (or was) challenged at trial.  If the defense vigorously challenges the primary victim's credibility, then evidence of the defendant's assault of other victims is more relevant, weighing in favor of admissibility.  *Julian*, 427 F.3d at 487; *see also Benally*, 500 F.3d at 1092 (affirming district court's admission of testimony of four victims other than victim charged in

---

[5]And as described in detail above, certain of Victim E's encounters with McGuire – such as McGuire's examination of Victim E's penis with a magnifying glass, and the statements McGuire made to Victim E – were strikingly similar to Victim A's.

indictment, in part "because of questions about the credibility of the child witnesses").

Here, given the nature of the case, witness credibility will be the central issue of the trial. As the Seventh Circuit and other courts have endorsed, following Congress's clear directive, other sexual assault victims' testimony should be admitted as probative of whether the acts charged in the indictment in fact occurred as alleged. *Julian*, 427 F.3d at 488 (concluding that court did not abuse discretion in admitting prior-assault evidence, because jury was permitted reasonably to infer from prior assault that defendant "was a pedophile and in turn surmise that his involvement with [the charged victims] was not as innocent as the defense made it out to be"). Moreover, as discussed further in Section II(D), below, the probative value of this evidence is not substantially outweighed by unfair prejudice. *Gabe*, 237 F.3d at 960 ("[The] testimony is prejudicial to Gabe for the same reason it is probative – it tends to prove his propensity to molest young children in his family when presented with an opportunity to do so undetected. Because propensity evidence is admissible under Rule 414, this is not *unfair* prejudice."); *United States v. LeCompte*, 131 F.3d 767, 770 (8th Cir. 1997) (reversing district court's exclusion of other-molestation evidence under Rule 403 due to "unique stigma" of child sexual abuse as an abuse of discretion, because "[t]his danger is one that all propensity evidence in such trials presents. It is for this reason that the evidence was previously excluded, and it is precisely such holdings that Congress intended to overrule.").

## II.    The Government Will Also Offer Testimony Under Rule 404(b)

In the alternative, the government seeks to admit the aforementioned evidence pursuant to Federal Rule of Evidence 404(b).

As a preliminary matter, the government notes that some of this evidence need not be considered Rule 404(b) evidence at all. "Other acts" evidence is admissible without reference to

Rule 404(b) if the evidence arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial. *United States v. Lahey*, 55 F.3d 1289, 1295-96 (7th Cir. 1995) (evidence admissible where evidence is "inextricably intertwined" with, or completes the story of, a charged offense; *United States v. King*, 126 F.3d 987, 995 (7th Cir. 1997). If the evidence is so related, "the only limitation on the admission of such evidence is the balancing test required by Rule 403." *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir. 1993).[6]

Victim F's testimony offers direct evidence concerning McGuire's conduct as to Victim A, and, at a minimum, is intricately related to the charged offense. Victim F overlapped with Victim A as McGuire's assistant, and directly observed McGuire's interactions with Victim A. Victim A took over Victim F's "duties," which included the travel, the so-called "massages," and the pornography studies.[7]

---

[6] It is true that a recent Seventh Circuit case questioned the usefulness of the inextricably-intertwined doctrine. *United States v. Taylor*, 522 F.3d 731, 734-35 (7th Cir. 2008). However, *Taylor* did not explicitly overrule the long-established precedent adopting the doctrine, nor could the opinion do so without *en banc* review or circulation of the opinion pursuant to Seventh Circuit Rule 40(e). Indeed, after *Taylor* was decided, the Seventh Circuit again applied the inextricably-intertwined doctrine to affirm the introduction of evidence that explained the chronology of events leading up to the charged crime, *United States v. Samuels*, 521 F.3d 804, 813 (7th Cir. 2008), and evidence of prior criminal acts that showed how a relationship of trust and cooperation developed into the charged crime, *United States v. Wantuch*, 525 F.3d 505, 517-18 (7th Cir. 2008); *United States v. Gilmer*, 534 F.3d 696, 705-06 (7th Cir. 2008).

[7] Likewise, the government intends to introduce at trial evidence concerning various restrictions that the Jesuits placed on McGuire's ability to travel with minors, and later, individuals under the age of 21, and still later, individuals under the age of 30. These restrictions were in place beginning in 1991 and continuing throughout the entire time period at issue here. Just as with Victim F's testimony, the government regards evidence concerning the travel restrictions as direct evidence of McGuire's intent, and as intricately related. Out of an abundance of caution, the government hereby gives notice that such evidence could also be admitted under Rule 404(b), as evidence of McGuire's intent, plan, and motive.

22

If, however, the Court does not admit testimony of Victims B through E under Rules 413 or 414, and/or of Victim F as direct or intricately related evidence, all of the testimony is also admissible pursuant to Rule 404(b).  In admitting evidence under Rule 404(b), courts apply the following four-part test:  whether the evidence (1) is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) is sufficient to support a jury finding that the defendant committed the similar act, and (4) has probative value that is not substantially outweighed by the danger of unfair prejudice.  *Id.*  As is discussed further below, all four factors are met in this case.

### A.     The Evidence Proves Issues other than Propensity

First, to the extent that the Court does not admit evidence under Rules 413 or 414, but instead admits such evidence under Rule 404(b), such evidence will not come in to show the defendant's propensity to molest boys.[8]  Rather, the evidence will be offered to establish defendant's intent, *modus operandi*, and motive for engaging in sexual contact with Victim A.  All of these are permissible purposes pursuant to Rule 404(b).  *United States v. Kieffer*, 68 Fed. Appx. 726, 728 (7th Cir. 2003).

The *Kieffer* case is instructive on this point.  In *Kieffer*, the defendant was charged with traveling interstate with the intent to engage in illicit sexual conduct with a minor in violation of 18 U.S.C. § 2423(b).  *Id.* at 727.  In support of the charged conduct, the government offered testimony from a victim who had traveled with the defendant and been molested under similar circumstances

---

[8]As discussed above, however, the government's primary argument is that the testimony of Victims B through E should come in under Rules 413 and 414, which permit the evidence to be used for any relevant purpose, including to show propensity.

as were alleged in the indictment.  *Id.*  The Seventh Circuit affirmed the district court's admission

of this victim's testimony, stating that

> [t]he fact that [the defendant] once tried to engage in sexual conduct
> with another much-younger family member on an interstate trip is
> certainly relevant to whether an intention to engage in sexual conduct
> prompted the interstate travel with the [complaining witnesses].

*Id*. at 729.  Moreover, the Seventh Circuit found that this evidence "helped to demonstrate both

intent and modus operandi . . . because it revealed [the defendant's] distinctive way of luring his

young victims into a situation where sexual contact would be easy to establish."  *Id*. at 729.  In

reaching this decision, the Court discussed how the defendant's approach to the victim "strongly

resembled" the approach to the victims named in the indictment.  *Id.*  Given the similarities and

"consistent pattern" used by the defendant, the Court found that the admission of the evidence for

the purpose of proving intent and *modus operandi* was appropriate.  *Id.*

Just as in *Kieffer*, in this case the defendant engaged in a consistent pattern of sexual abuse

with young boys.  Defendant's conduct with each of the victims was very similar and very

distinctive.  For that reason, it is appropriately admitted pursuant to Rule 404(b) for both the

purposes of proving intent and *modus operandi*.

In addition to intent and *modus operandi*, the proffered testimony serves to establish

defendant's motive for engaging in the instant crime.  The Seventh Circuit has recognized that

"[p]rior instances of sexual misconduct with a child victim may establish a defendant's sexual

interest in children and thereby serve as evidence of the defendant's motive to commit a charged

offense involving sexual exploitation of children."  *Sebolt*, 460 F.3d at 917; *see also United States

v. Cunningham*, 103 F.3d 553, 556 (7th Cir. 1996) ("Most people do not have a taste for sexually

molesting children.  As between two suspected molesters, then, only one of whom has a history of

such molestation, the history establishes a motive that enables the two suspects to be distinguished.").  As sexual interest in children is a hard concept for many jurors to accept and understand, such evidence is especially useful for the jury.  Moreover, as the court noted in *Sebolt*, "Rule 404(b) explicitly makes motive relevant, and establishing motive tends to prove a crime was committed."  *Id.*  For these reasons, defendant's lengthy history of abusing Victims B, C, D, E, and F serves to establish defendant's motive for engaging in sexual relations with Victim A, and therefore is properly admissible for that purpose.

Because defendant's abuse of Victims B, C, D, E, and F is directed towards proving defendant's intent, motive, and *modus operandi*, it should be admitted pursuant to Rule 404(b).

### B.       The Acts Are Similar Enough and Close Enough in Time to be Relevant

The second prong under Rule 404(b) – that the prior acts are similar enough and close enough in time to be relevant – is also met in this case.  With respect to the issue of similarity, the defendant's conduct need not be identical to the conduct charged, but instead need only be "similar enough to be probative of intent."  *United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997) (upholding the admission of 404(b) evidence that showed the defendant "shaping and grooming" another victim, even though the defendant did not ultimately have the same type of sexual contact with that victim as was alleged in the indictment).  As is discussed above, McGuire's acts with Victims B, C, D, E, and F are very similar to McGuire's acts with Victim A.  Moreover, the similarities are enough to make them highly probative of McGuire's intent in this case.  *See Kieffer*, 68 Fed. Appx. at 729 (finding enough similarity where victims shared the characteristics of vulnerable younger family members of the defendant).

The evidence of prior acts is also close enough in time to satisfy the relevancy requirement

under the second prong of Rule 404(b).  The Seventh Circuit has held that the passage of ten years or more is sufficient to satisfy the time requirement under Rule 404(b).  *United States v. Polichemi*, 219 F.3d 698, 709-10 (7th Cir. 2000) (ten years); *United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir. 1995) (13 years).  Other circuits, specifically addressing cases of child sexual abuse, have also held that a gap of ten years or more satisfies the relevancy requirement.  *Johnson*, 132 F.3d at 1283 (13 or more years); *Meacham*, 115 F.3d at 1495 (more than 30 years).

In this case, all of the testimony will focus on events within ten years before the events concerning Victim A.  Specifically, Victim A was molested by McGuire from 1999-2003.  Victim B will testify regarding 1989-1991 events, Victim C will testify regarding 1989-1992 events, Victim D will testify regarding events from 1992, Victim E will testify regarding events between 1989-1994, and Victim F will testify regarding events from 1998-1999.  Because all of the testimony is within ten years of McGuire's abuse of Victim A, it is close enough in time to be relevant.

## C.  The Evidence Is Sufficient to Support a Jury Finding that Defendant Committed the Similar Act

Moreover, the testimony of Victims B, C, D, E, and F is sufficient to support a jury finding that defendant engaged in the conduct alleged.  The victims' descriptions of their experiences with McGuire reveal a man with strong habits, such that the victims corroborate each other.  *United States v. Vik*, 655 F.2d 878, 881 (8th Cir. 1981) (testimony of three previous victims of defendant's abuse, each corroborating the other, was "clear and convincing").  The government also intends to call witnesses – who are not victims – who will testify concerning McGuire's interaction with Victims B through F.  These witnesses corroborate various parts of the victims' testimony, including the interstate and foreign travel and, to some extent, McGuire's showing pornography to certain of the victims.  Therefore, the third part of the 404(b) test is also satisfied.

### D.  The Probative Value Is Not Substantially Outweighed by Unfair Prejudice

Finally, the probative value of the proffered witness testimony is not substantially outweighed by unfair prejudice to the defendant.  While by its very nature all probative evidence that tends to establish the defendant's guilt is prejudicial, probative evidence should be excluded only if "*unfairly* prejudicial."  *Sebolt*, 460 F.3d at 917.  Moreover, the evidence should be admitted unless the probative value "*substantially* outweigh[s] [ ] the danger of unfair prejudice."  *Id.* (emphasis added).  Thus, the Seventh Circuit has upheld the district court's decision to admit evidence of child molestation because – as in the instant case – the evidence was not *unfairly* prejudicial in light of its significant probative value.  *Id.*

Here, the probative value of the evidence is extremely high, as the testimony will speak to defendant's intent, motive, and *modus operandi*.  It is very difficult for jurors to comprehend why an individual would be sexually attracted to children.  It will be especially difficult for jurors to comprehend why a caregiver and religious figure like McGuire would abuse Victim A in the way he did.  The fact that McGuire abused other victims in almost the exact same manner and for the same purposes as Victim A will show McGuire's intent and objectives more clearly than any other available evidence.  Therefore, the probative value of this evidence cannot be understated.

Moreover, the evidence will not be unduly prejudicial.  First of all, the jurors will be instructed concerning how they are permitted to use evidence this Court admits.  To the extent the Court admits certain evidence under Rule 404(b), the Court will instruct the jury concerning the limited purpose of such evidence.  *Seventh Circuit Committee Instruction 3.04* (1999); *Sebolt*, 460 F.3d at 917.  The Seventh Circuit has held that unfair prejudice by witness testimony in the context of child abuse can be "eliminated by the district court's limiting instructions."  *Kieffer*, 68 Fed.

Appx. at 730.  Secondly, although the evidence will be prejudicial, the jury will have already heard about the same type of evidence from Victim A.  Thus, there will be nothing especially emotionally disturbing or prejudicial about this evidence.  *Gabe*, 237 F.3d at 960 (in Rule 414 context, finding that because evidence of prior abuse was so similar to the charged conduct, "it would not be so facially inflammatory as to unduly divert attention from the issues of the case") (citation omitted).

Of course, there is no doubt that the evidence regarding other victims who were sexually assaulted is damaging to McGuire and his anticipated defense.  However, as the Seventh Circuit stated, "that's the idea." *United States v. Rutledge*, 40 F.3d 879, 885 (7th Cir. 1994) (reversed on other grounds, *Rutledge v. United States*, 515 U.S. 1157 (1996)).  "[I]n order to find that a particular piece of evidence must be excluded pursuant to Rule 403, its probative value must be *insignificant* compared to its inflammatory nature so that the evidence unfairly prejudices the defendant."  *Id.* (emphasis added).  That is simply not the case here.

For these reasons, the value of the witness testimony is not substantially outweighed by any resulting prejudice.  The testimony should be admitted pursuant to Rule 404(b).

## CONCLUSION

The government therefore respectfully provides notice that it intends to offer the testimony of Victims B, C, D, and E under Federal Rule of Evidence 413 and, as to Victims C and E, Federal Rule of Evidence 414.  The government further provides notice that, as an alternative, it intends to

offer such testimony under Rule 404(b).  The government also provides notice of its intent to offer

Victim F's testimony as direct evidence concerning the counts in the indictment, and as Rule 404(b)

evidence.

Dated:  September 5, 2008                         Respectfully submitted,
                                                 PATRICK J. FITZGERALD
                                                 United States Attorney


                                         By:     s/ Julie B. Ruder and April M. Perry
                                                 JULIE B. RUDER
                                                 APRIL M. PERRY
                                                 Assistant U.S. Attorneys
                                                 219 South Dearborn Street
                                                 Chicago, Illinois 60604
                                                 (312) 353-5300

29

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned Assistant United States Attorney hereby certifies that the following document:

Government's Notice of Intent to Offer Evidence Under Rules 413 and 414, or, in the Alternative, Under Rule 404(b)

was served on September 5, 2008, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/ Julie B. Ruder
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
(312) 353-5300